**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 23-2023**

---

ALLEGIS GROUP, INC.; ASTON CARTER, INC.,

        Plaintiffs - Appellants,

   v.

CHRISTOPHER J. BERO,

        Defendant- Appellee.

---

Appeal from the United States District Court for the District of Maryland at Baltimore. Ellen Lipton Hollander, Senior District Judge.  (1:22-cv-00686-ELH)

---

Argued:  December 13, 2024                            Decided:  July 29, 2025

---

Before RICHARDSON, BENJAMIN and BERNER, Circuit Judges.

---

Affirmed by unpublished per curiam opinion.

---

**ARGUED:**  Alexander Thomas MacDonald, LITTLER MENDELSON PC, Washington, D.C., for Appellants.  Benjamin Fink, BERMAN FINK VAN HORN P.C., Atlanta, Georgia, for Appellee.  **ON BRIEF:**  Paul J. Kennedy, Washington, D.C., Timothy A. Rybacki, LITTLER MENDELSON, P.C., Nashville, Tennessee, for Appellants.  Jeremy L. Kahn, BERMAN FINK VAN HORN P.C., Atlanta, Georgia; Joshua A. Glikin, BOWIE & JENSEN LLC, Towson, Maryland, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Christopher Bero worked for Aston Carter, a staffing company, until he left to take a position with one of Aston Carter's competitors. After Bero left the company, Aston Carter and its parent company Allegis Group brought this lawsuit against Bero alleging that he violated their employment agreement.[1] The district court granted summary judgment in favor of Bero. We affirm.

## I.      Background

Aston Carter is a Maryland-based company that helps businesses throughout the United States locate, screen, and select candidates to fill temporary and permanent positions. Aston Carter provides these staffing services in the fields of accounting, finance, operations, administration, and customer support. Allegis Group is Aston Carter's parent company. We refer to Aston Carter and Allegis Group collectively as "the Employers."

Bero began working at Aerotek, a different subsidiary of Allegis Group, in the Los Angeles area in 2012. In 2020, he relocated to Tennessee to assume a different position with Aerotek in the Nashville area. Bero worked for Aerotek until January 2021, when Allegis Group transferred him to Aston Carter. When he started working for Aston Carter, Bero signed an employment agreement with the company (the Employment Agreement). The Employment Agreement, which was drafted by the Employers, contains three

---

[1] This appeal involves similar facts and legal issues as those involved in *Aerotek v. Nosky*, No. 24-1372 (4th Cir. 2025).

provisions relevant to this appeal: a non-solicitation covenant, a nondisclosure covenant, and a provision concerning return and preservation of company records.

In December 2021, less than one year after Bero went to work at Aston Carter, Bero was contacted through LinkedIn by a recruiter from Jobot, an Aston Carter competitor. Bero commenced discussions with Jobot regarding a position there. On January 17, 2022, Jobot extended a formal job offer, which Bero accepted on January 24, 2022. Bero gave two weeks' notice to Aston Carter. Rather than waiting the full two weeks, however, Aston Carter terminated Bero a few days later. Bero started working for Jobot in the middle of February 2022.

After Jobot contacted Bero through LinkedIn but before he accepted the position at Jobot, Bero sent several emails from his Aston Carter email account to his personal Gmail account. The first email contained an Excel spreadsheet entitled "Copy of Spread Negotiations Tool.xls." J.A. 1164. This spreadsheet was a tool used at Aston Carter to make calculations during negotiations. The second email also had an Excel spreadsheet attached to it. This spreadsheet, entitled "new book of biz.xlsx," listed names and contact information for several Aston Carter clients. J.A. 1124.

After Bero accepted Jobot's offer of employment but before he left Aston Carter, Bero sent two more emails from his Aston Carter account to his personal Gmail account. These emails contained work-related discussions between Bero and Freddie Brouse, a representative for Aston Carter client Schneider Electric.

Shortly after Bero started working at Jobot, he contacted Brouse and Alfonso Vides, a representative for Dave.com. Bero offered to help Brouse and Vides fill a software

3

engineer and a data scientist position, respectively. Both Brouse and Vides were listed in the "new book of biz.xlsx" spreadsheet Bero had sent to his personal Gmail account. Significantly, Bero's outreach to Brouse and Vides did not lead to any new business for Jobot.

The Employers sued Bero, alleging that he violated three provisions of the Employment Agreement.[2] After discovery, the Employers and Bero (the Parties) filed cross motions for summary judgment. The district court denied the Employers' motion and granted summary judgment for Bero. In a comprehensive opinion, the district court analyzed the Employment Agreement's non-solicitation and nondisclosure covenants and concluded that both were unenforceable under Maryland law. *Allegis Grp., Inc. v. Bero*, 689 F. Supp. 3d 81, 128–29, 133–34 (D. Md. 2023). The district court further ruled that the provision requiring the return and preservation of company records did not require employees or former employees to return emails. *Id.* at 135–37. The Employers timely appealed.

## II.      Analysis

We apply Maryland contract law in this case arising under diversity jurisdiction. 28 U.S.C. § 1291; *Moore v. Equitrans, L.P.*, 27 F.4th 211, 220 (4th Cir. 2022). We review a district court's grant of summary judgment *de novo*, viewing the facts in the light most favorable to the non-moving party and drawing all inferences in its favor. *Parkway 1046,*

---

[2] Although the Employers raised other claims before the district court, they have not pursued these claims on appeal and thus we do not address them.

4

*LLC v. U. S. Home Corp.*, 961 F.3d 301, 312 (4th Cir. 2020); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254–55 (1986). Where parties file cross-motions for summary judgment, we consider each motion separately and view the facts in the light most favorable to the party opposing *that* motion. *Defs. of Wildlife v. N. Carolina Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014). Here, because we review only the grant of Bero's motion, we view the facts in the light most favorable to the Employers.

We address three issues on appeal: whether the district court erred in granting summary judgment to Bero on the Employers' claims that Bero breached: 1) the non-solicitation covenant; 2) the nondisclosure covenant; and 3) the return and preservation provision. We address each issue in turn.

Maryland follows the objective theory of contract interpretation. *Credible Behav. Health, Inc. v. Johnson*, 220 A.3d 303, 310 (Md. 2019). This theory requires that courts interpret contracts based on "what a reasonable person in the position of the parties would have understood the [contract] language to mean and not the subjective intent of the parties at the time of formation." *Id.* (internal citation omitted). We must construe any ambiguities in contract language against the drafter. *Id.* at 314.

## A. The Non-Solicitation Covenant

The Employers argue that Bero violated the Employment Agreement's non-solicitation covenant by contacting two clients after he left Aston Carter and went to work for its competitor, Jobot. Bero replies that the non-solicitation covenant is unenforceable

5

under Maryland law, and in the alternative, that he did not violate it. Because we agree that he did not violate the covenant, we decline to reach the question of its enforceability.

The non-solicitation covenant provides as follows:

**NON-SOLICITATION COVENANT:** EMPLOYEE agrees that upon the termination of EMPLOYEE's employment, whether by COMPANY or EMPLOYEE and whether with or without cause, for the Restricted Period EMPLOYEE shall not directly or indirectly: (a) Communicate with any individual or entity which is a Covered Customer for the purpose of: (i) entering into any business relationship with such Covered Customer if the business relationship is competitive with any aspect of COMPANY's Business (or any COMPANY affiliate which employed EMPLOYEE during the Look Back Period) for which EMPLOYEE performed services or about which EMPLOYEE obtained Confidential Information during the Look Back Period, or (ii) reducing or eliminating the business such customer conducts with COMPANY (or any COMPANY affiliate which employed EMPLOYEE during the Look Back Period).

J.A. 27–29.

The Employment Agreement defines "Covered Customer" as a person or entity that the employee had "business-related contact with or obtained confidential information about during the Look Back Period, and . . . those persons or entities with whom COMPANY had a reasonable expectation of doing business." J.A. 29.  The "Look Back Period" is the two years before the employee leaves the company.

By its terms, this covenant does not forbid all communication that may compete with an aspect of Aston Carter's business.  Instead, as relevant here, it applies only to communication with clients "competitive with any aspect of COMPANY's Business . . . for which EMPLOYEE performed services or about which EMPLOYEE obtained Confidential Information during the Look Back Period."  J.A. 28.

6

The Employers argue that Bero breached this provision twice, first by approaching Alfonso Vides at Dave.com about filling a data scientist position, and second by contacting Freddie Brouse at a Schneider Electric subsidiary about filling software engineer positions. But as the district court observed, Bero never performed services for those business areas at Aston Carter. We therefore agree with the district court that Bero's recruiting efforts at Jobot "did not relate to the business areas Bero serviced while at Aston." *Bero*, 689 F. Supp. 3d at 132. Indeed, because Aston Carter does not seem to place data scientists or engineers at all, Bero's acts were not "competitive with any aspect of [Aston Carter]'s business." J.A. 27–28.

The Employers counter that the non-solicitation provision covers not just its own territory but that of its affiliates, including Aerotek, where Bero worked toward the beginning of the Look Back Period. But this approach fares no better, because although Aerotek performs some science and engineering placements generally, the Employers do not allege that Bero performed services for that aspect of the business while he was there.

Next, the Employers claim that even if Bero did not perform services for these business areas at either company, he at least learned confidential information about them during his tenure. But they do not explain what confidential information Bero learned, about either Schneider Electric or Dave.com. In their brief, the Employers gesture at "company databases" ostensibly containing "placements, prices, [and] costs" about Schneider Electric and Dave.com. Employers Opening Br. at 34. Yet neither their allegations nor their evidence support this claim. To avoid summary judgment, the Employers needed evidence of what confidential information the databases contained, and

7

evidence that Bero accessed the databases and learned the information. The closest they come to identifying a breach is their claim that Bero obtained Freddie Brouse's contact information through Aston Carter. But the evidence the Employers cite in support of this claim only undermines it. It shows that far from being confidential, Brouse's contact and industry information appear on Schneider's LinkedIn page.

## B. The Nondisclosure Covenant

The Employers next claim that Bero violated the Employment Agreement's nondisclosure covenant. That covenant provides as follows:

> **COVENANT NOT TO DIVULGE CONFIDENTIAL INFORMATION:** EMPLOYEE covenants and agrees that, except as required by the proper performance of EMPLOYEE's duties for COMPANY, EMPLOYEE shall not use, disclose or divulge any Confidential Information of COMPANY (or any COMPANY affiliate which employed EMPLOYEE during the Look Back Period) to any other person or entity besides COMPANY. For purposes of this Agreement, "Confidential Information" shall mean information not generally known by the competitors of COMPANY or the general public concerning COMPANY's Business that COMPANY takes reasonable measures to keep secret, including but not limited to: financial information and financial controls; sales and marketing strategies; acquisition plans; pricing and costs; customers' names, addresses, e-mail addresses, telephone numbers, and contact persons; customers' staffing requirements; margin tolerances regarding pricing; the names, e-mail addresses, addresses, telephones numbers, skill sets, availability and wage rates of Contract Employees; sales, recruiting, pricing and marketing techniques; sales and recruiting manuals; forms and processes for acquiring and recording information; management analysis of salaries based on market competitiveness, employee compensation, and performance evaluations of Regular Employees; and management practices, procedures and processes. These restrictions on use or disclosure of Confidential Information will only apply for two (2) years after the end of EMPLOYEE's employment where information that does not qualify as a trade secret is concerned. The restrictions will apply to trade secret information for as long as the information remains qualified as a trade secret.

8

J.A. 30–31.

The nondisclosure covenant prohibits an employee or former employee from disclosing confidential information to "any other person or entity." J.A. 30–31. Yet the Employers do not allege that Bero disclosed information belonging to the Employers to a third party, nor have they produced any evidence of him having done so. To the contrary, the Employers' claim rests entirely on Bero's having sent confidential information to *himself* at his personal email address. Because the Employers presented no evidence that Bero sent confidential information to "any other person or entity," the Employers' claim that Bero violated the nondisclosure covenant necessarily fails.

As a last-ditch effort to preserve their claim under the nondisclosure covenant, the Employers point to fact that the nondisclosure covenant prohibits the "use" of confidential information. They argue that Bero *used* allegedly confidential information when he forwarded it to himself. Reading the contract sentence in full, the nondisclosure covenant prohibits not simply the "use" of confidential information but the "use . . . *to any other person or entity* . . ." J.A. 30 (emphasis added). The Employers put forward no evidence, nor do they argue, that that Bero "use[d]" any confidential information *to* any "other person or entity." Nor could they. The idea of "us[ing]" information "to any other person or entity" makes no sense grammatically. It is, at best, ambiguous as to its meaning. Because Maryland law requires us to construe ambiguities against the drafter, we must construe this contract language against the Employers. *Credible Behav. Health, Inc.*, 220 A.3d at 314 (quoting *Prima Paint Corp. v. Ammerman*, 287 A.2d 27, 28 (Md. 1972) ("[A] contract will

9

be 'most strongly construed against' its drafter when a court finds the contractual terms at issue to be ambiguous.").

Because the Employers failed to create a genuine issue of material fact as to whether Bero violated the nondisclosure covenant, we affirm the district court's grant of summary judgment for Bero on this claim.

### C. The Return and Preservation Provision

Finally, the Employers assert that Bero breached the Employment Agreement's return and preservation provision because he did not return email messages that he had forwarded to his personal Gmail account.

The return and preservation provision provides, in relevant part, as follows:

> **RETURN AND PRESERVATION OF RECORDS:** EMPLOYEE agrees, upon termination of EMPLOYEE's employment with COMPANY for any reason whatsoever or sooner if requested, to return to COMPANY all records and other property (whether on paper, computer discs or in any other form and including, but not limited to, Confidential Information), and copies thereof, belonging or pertaining to COMPANY (collectively "Company Records"), subject to Paragraph 16. EMPLOYEE further agrees not to engage in any unauthorized destruction or deletion of Company Records during employment or upon termination of employment, including, without limitation, the deletion of electronic files, data, records or e-mails.

J.A. 31–32.

Under Maryland law of contract interpretation, where a contract contains an express term, that term will be construed to negate "an implied, inconsistent term relating to the same aspect of the contract." *Myers v. Kayhoe*, 892 A.2d 520, 527 (Md. 2006) (internal citation omitted). As discussed, Maryland law also requires us to construe contract

10

ambiguities against the drafter. *Credible Behav. Health, Inc.*, 220 A.3d at 314 (internal citation omitted). These principles guide our analysis.

Here, the *preservation* requirement in the return and preservation provision explicitly states that an employee or former employee must preserve company records, including emails, and precludes the employee from deleting or destroying them absent authorization. The *return* requirement, by contrast, does not specify emails as among the items that must be returned upon termination of employment. Because the preservation requirement expressly includes a reference to emails while the return requirement does not, we cannot conclude that the parties intended to require emails to be returned. *See Myers*, 892 A.2d at 527.

The Employers drafted the Employment Agreement and could have specified that an employee must return all emails upon termination of employment just as the Employers specified that emails must be preserved. They failed to do so. At a minimum, we find the return requirement to be ambiguous as to whether the parties intended to include a requirement that emails be returned.[3] Construing this ambiguity against the drafters, as we must, we find that the Employment Agreement's return and preservation provision did not require Bero to return emails that he sent to himself from his Aston Carter email account. Accordingly, we affirm the district court's grant of summary judgment to Bero on this final claim.

---

[3] The Parties discuss at length whether an email can ever, in fact, be "returned" and what that would entail. Because we find the return and preservation provision does not require the return of emails, even if this were possible, we need not reach the technical question of how—if at all—this would be accomplished.

11

III.     Conclusion

For the reasons set forth above, we affirm the district court order granting summary judgment to Bero.

*AFFIRMED*